## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PEARL RODRIGUEZ, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Civil Action No: 3:24-cv-1993 |
| v. | **CLASS-ACTION COMPLAINT** |
| TRUMBULL INSURANCE COMPANY, HARTFORD INSURANCE COMPANY OF THE SOUTHEAST, and JOHN DOES 1 through 21, | **JURY TRIAL DEMANDED** |
| Defendants. | **December 17, 2024** |

## CLASS ACTION COMPLAINT

Plaintiff Pearl Rodriguez ("Plaintiff"), on behalf of herself and all others similarly situated, hereby alleges against Defendant Trumbull Insurance Company ("Trumbull"), Defendant Hartford Insurance Company of the Southeast ("Hartford Southeast"), and Defendants John Does 1 through 21 (collectively, "Defendants") the following based upon her own knowledge, or where she lacks personal knowledge, upon information and belief including the investigation of her counsel.

## NATURE OF THE ACTION

1.     This class action arises out of Defendants' uniform misconduct related to their failure to pay the full actual cash value ("Actual Cash Value" or "ACV") and applicable sales tax owed to insureds when Defendants declare insureds' automobiles total losses and Defendants pay these total loss claims purportedly pursuant to Defendants' standardized personal auto insurance policies. Defendants, as well as 18 other insurance companies that write personal automobile insurance policies, are all insurers operating under "The Hartford" brand (the "Hartford Insurer Group"). They have a common parent company, Hartford Financial. All The Hartford insurers use the same claim administrator, Defendant John Does 1 through 21 to process and pay out total loss claims from The Hartford Centralized Total Loss Center on their behalf. As such, they all use

the same process and procedure to pay out claims pursuant to standardized auto policy provisions. Defendant Trumbull as well as the other The Hartford insurers, through the actions of their claims administrator, Defendant John Does 1 through 21 systematically breach their standardized personal auto policies with their insureds (including Plaintiff) in two ways.

2.       First, Defendants' standardized auto policies with Plaintiff and the other members of the Classes (defined below), promise that, in the event of a "total loss" to an insured auto – where a vehicle cannot be repaired safely or it is considered economically impractical to repair -, Defendants will pay for the covered loss, limited to the ACV of the auto.  *See* the form policy issued to Plaintiff by Defendant Trumbull attached as Exhibit 1 at p. 14 of 31; *see also* the form policy issued to Plaintiff by Defendant Hartford Southeast attached as Exhibit 4 at p. 12 of 15.[1] Defendant Trumbull's limit of liability provision in this policy is either identical to or materially the same as the limit of liability provision in the other standardized auto policies it issues in at least 17 other states.

3.       Despite this promise, Defendants use a third-party vendor, Mitchell International, Inc. ("Mitchell"), to determine the ACV of total loss autos by having Mitchell run "Vehicle Valuation Reports" (or "Report(s)") for each total loss claim.  Defendants direct Mitchell as to the types of information to include on these Reports, including whether to apply Projected Sold Adjustments ("PSAs") to calculate the ACV owed for the total loss auto. Mitchell, via the direction

---

[1] The Trumbull policy attached hereto as Exhibit 1 is the form policy Trumbull filed with the Illinois Department of Insurance via the System for State Electronic Rate and Form Filing ("SERFF"), with an effective date of August 2, 2005. *See* SERFF Filing # SERT-6CGLDA340. This is the only form personal automobile policy available for Trumbull in Illinois via SERFF.  Upon information and belief, this policy was the policy issued to Plaintiff and other members of the Classes who were issued Trumbull policies in Illinois. Similarly, the Hartford Southeast policy attached as Exhibit 4 is the form policy Hartford Southeast filed via SERFF, with an effective date of March 31, 2021. *See* SERFF Filing # HART-132609030. This is the only form personal automobile policy available for Hartford Southeast in Illinois via SERFF.  Upon information and belief, this policy was the policy issued to Plaintiff and other members of the Classes who were issued Hartford Southeast policies in Illinois.

of Defendants, systematically applies PSAs when running the Vehicle Valuation Reports for Defendants, which results in a significant downward adjustment to the value of each comparable vehicle used in the Report to determine the ACV of the totaled auto. This, in turn, reduces the ACV of the total loss auto and results in insureds failing to be paid the full ACV for their total losses as promised by the policy. For Plaintiff, application of the PSAs to the comparable vehicles used in the Mitchell's Vehicle Valuation Report to calculate the ACV of her totaled auto resulted in her being paid roughly $437.60 less than the full ACV. In doing so, Defendants systematically thumb the scale when calculating totaled autos' ACV in their favor, resulting in them underpaying Plaintiff's and other members of the Classes' total loss claims.

4.      The PSAs Defendants routinely apply and rely on are invalid and are arbitrary. They are not based on fact, they defy the used car industry's market pricing and inventory management practices and they run contrary to appraisal standards. The only rationale provided for their use is a vague sentence buried inside the Vehicle Valuation Reports stating PSAs "reflect consumer purchasing behavior (negotiating a different price than the listed price)." *See* Exhibit 2 at p. 8 (Plaintiff's Vehicle Valuation Report). This non-descript statement, which tells the consumer nothing about what specific, documented and verifiable data is being relied on to justify the PSA's use, is nothing more than a thinly veiled attempt by Defendants to shirk their responsibilities to pay the full ACV owed to Plaintiff and other members of the Classes under their policies. Indeed, the PSAs applied assume, without exception, that all car buyers will negotiate the advertised list price down. There is no data to support this wholesale downward adjustment, let alone the specific amount of the downward adjustment used. In fact, in the age of the Internet where comparison shopping is prevalent, and particularly during the height of the COVID-19 pandemic when Plaintiff's total loss occurred and during which used cars were being sold way above the advertised list price, used car dealers simply no longer readily give buyers a discounted sales price from the

advertised listed price.[2] Thus, the PSAs applied are at-odds with market realities and run contrary

to appraisal standards.[3]

---

[2] *See, e.g.,* https://www.coxautoinc.com/learning-center/2019-car-buyer-journey-study/ (2019 car buying study stating that more car buyers make car purchasing decisions using the Internet ahead of time, which requires dealers to "have a strategy to help buyers get to 'yes' online[]"); https://dealerservices.covideo.com/blog/no-haggle-car-buying/ ("For some buyers, the age-old tradition of negotiating their price at a dealership has begun to lose its luster. Consumers have a world of information at their fingertips paired with nearly unlimited online buying options, which has made them prioritize transparency . . . . No-haggle car buying reflects evolving consumer preferences and expectations in the automotive industry."); https://money.com/haggling-car-dealership-is-disappearing/ ("Overall, haggling at the car dealership has simply faded ever since supply shortages emerged in the auto industry in 2021. Car dealerships generally aren't under much pressure to move vehicles by offering discounts or engaging in negotiations with customers because their cars are still selling fast for around the full price or more."); https://www.forbes.com/sites/dalebuss/2021/09/21/online-creates-trust-in-car-dealers-by-young-consumers-study-says/ ("Young consumers are more likely to trust the auto-sales process the more that it moves online."); https://web.archive.org/web/20240707053541/https://www.kbb.com/car-news/dealers-paying-more-for-used-cars-prices-likely-to-rise-again/ (used car prices increased by 27% over the calendar year in 2020); https://www.capitalone.com/cars/learn/finding-the-right-car/why-usedcar-prices-are-finally-dropping/2697 (explaining why the prices of used cars rose during the COVID-19 pandemic). *Cf.* https://www.digitaltrends.com/cars/harris-poll-survey-consumer-automotive-index-beepi-frustration/ (summarizing results of a 2016 study finding that "of parents with children under 18, 80 percent 'would rather do anything else unpleasant than negotiate with a dealership salesperson'").

[3] For example, the 2024 Uniform Standards of Professional Appraisal Practice ("USPAP"), which "represents the generally accepted and recognized standards of appraisal practice in the United States", *see* USPAP at p. vii, and which some automotive appraisal organizations recognize and follow, https://autoappraisalnetwork.com/classic-car-valuation-tips/franchise-automobile-1525704014.html, requires appraisers to keep "all [] data, information and documentation necessary to support the appraiser's opinions and conclusions and to show compliance with USPAP, or references to the location(s) of such other data, information, and documentation" in the work file for each appraisal or appraisal review assignment. *See* USPAP, Record Keeping Rule, at p. 12. The USPAP also requires appraisers to generate reports that contain "sufficient information to allow the client and other intended users to understand the scope of the work performed" and prohibits them from "caus[ing] the assignment results to be biased" or allowing assignment conditions to cause assignment results that are not credible in the context of their intended use. *Id.*, Scope of Work Rule, at p. 16. With regard to personal property appraisals, such as appraisals of private passenger automobiles, the USPAP requires appraisers to "not commit substantial error of omission or commission that significantly affects an appraisal", "not render appraisal services in a careless or negligent manner", and "identify, from sources the appraiser reasonably believes to be reliable, the characteristics of the property that are relevant to the type and definition of value and the intended use of appraisal". *Id.,* Standard Rules 7-1 and 7-2, at pp. 45-46. Specifically, "[i]n developing a personal property appraisal, an appraiser must collect, verify, and analyze all

5.      Second, Defendant Trumbull and Hartford Southeast, through their common claim administrator, Defendant John Does 1 through 21 systemically breach their standardized personal auto insurance policies with their insureds (including Plaintiff) that expressly state the "applicable sales tax" will be paid for damaged or stolen autos declared a total loss. *See* Exhibit 1 at p. 24 of 31; Exhibit 4 at p. 12 of 15.  This express policy provision is in all of Trumbull's standardized personal auto policies it issues in at least 18 states and all of Hartford Southeast's standardized personal auto policies it issues in at least 22 states.  Upon information and belief, the same or materially identical policy provision appears in the standardized personal auto policies issued by the other insurers operating under "The Hartford" brand for whom Defendant John Does 1 through 21 acts as the claim administrator.  Despite the clear and unambiguous sales tax provision in Defendants' standardized personal auto policies, Defendants Trumbull and Hartford Southeast, through the actions of the claim administrator, Defendant John Does 1 through 21 routinely fail to pay the full applicable sales tax as part of total loss claim payments to their insureds.  Indeed, Defendants represent on the standardized written settlement statements they issue to insureds that "$0.00" sales tax is owed for the totaled auto or otherwise inaccurately understate the amount of sales tax owed to their insureds.  This is despite Defendants using Mitchell Vehicle Valuation

---

information necessary for credible assignment results" and "reconcile the quality and quantity of data available and analyzed within the approach or approaches used." *Id.,* Standard Rules 7-4 and 7-6, at pp. 47-48.  All personal property appraisal reports must "clearly and accurately set forth the appraisal in a manner that will not be misleading", "contain sufficient information to enable the intended user(s) of the appraisal to understand the report properly", and "summariz[e] the information analyzed and the reasoning that supports the analyses, opinions, and conclusions, including reconciliation of the data and approaches". *Id.,* Standard Rules 8-1 and 8-2, at pp. 49-50. The Vehicle Valuation Reports Defendants Trumbull and Hartford Southeast, through their claims administrator, Defendant John Does 1 through 21 direct Mitchell to generate do not state the data relied upon for use of the PSAs and do not sufficiently explain the reason for the use of the PSAs to the intended users (*i.e.*, the total loss claimants such as Plaintiff and other members of the Classes). Accordingly, use of the PSAs in the manner applied here violates the USPAP. Similarly, use of the PSAs is not expressly permitted by some states' appraisal of total loss laws. *See, e.g.,* Ill. Admin. Code tit. 50, § 919.80(c).

Reports, which show an amount of sales tax that should be paid to the insured, under the "applicable sales tax" policy provision.

6.      Defendants' reliance on the parts of the Mitchell Vehicle Valuation Reports that suit them (*i.e.*, resulting in paying less money to insureds for their total loss claims) while, at the same time, ignoring parts of the Vehicle Valuation Reports that confirm insureds are owed more than what Defendants actually pay them (*i.e.*, the statement of sales tax owed for the totaled auto) shows that Defendants capitalize on any opportunity they can to pay insureds less than what they are owed under their policies.

7.      Defendants' uniform practice of applying arbitrary and baseless PSAs to reduce the value of the total loss auto and failing to pay the applicable sales tax as expressly required by the policy for monetary ACV total loss claim payments results in insureds not being paid the full ACV for their total loss autos. Plaintiff currently has an auto insured by Defendant Hartford Southeast, and was previously insured and underpaid ACV and sales tax by Defendant Trumbull for her total loss claim.  Because both Defendants Trumbull and Hartford Southeast are insurers under "The Hartford" brand with materially identical policy provisions using a common claim administrator, Plaintiff is concerned that, like Trumbull, Hartford Southeast will also fail to fulfill its obligations under the policy to pay full ACV and full applicable sales tax in the event her current auto is totaled.

8.      As such, Plaintiff brings this class action on behalf of herself and all others similarly situated to: (1) recoup the money owed by Defendants for the full ACV under the terms of their standardized form personal auto policies; (2) recoup the money owed by Defendants for the full applicable sales tax for totaled autos pursuant to the express terms of their standard form personal auto policies; and (3) secure a declaration of rights as to whether these same or materially similar policy provisions in Defendant Hartford Southeast's form policies, one of which currently insures Plaintiff's current auto in the State of Illinois, require payment of the full ACV and the full

6

applicable sales tax for totaled autos.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because: (a) the Plaintiff is a member of the Classes defined herein, each of which consists of at least 100 members, and she and the Defendants are citizens of different states; (b) the amount-in-controversy exceeds $5 million dollars exclusive of interest and costs; and (c) none of the § 1332 exceptions apply to this claim.

10.     This Court also has jurisdiction under 28 U.S.C § 1331 to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between Plaintiff and other members of the Projected Sold Adjustment Declaratory Judgment Class (defined herein) and Defendant Hartford Southeast as to their respective rights and obligations under the standardized personal auto insurance policies issued to Plaintiff and members of this Class.  As detailed more fully herein, there is an actual controversy as to whether Defendant Hartford Southeast's practice of applying a Projected Sold Adjustment when calculating the value of claimants' total loss autos would result in Defendant Hartford Southeast failing to pay the ACV of the auto as promised by the policy.

11.     This Court also has jurisdiction under 28 U.S.C § 1331 to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between Plaintiff and other members of the Sales Tax Declaratory Judgment Class (defined herein) and Defendant Hartford Southeast as to their respective rights and obligations under the standardized personal auto insurance policies issued to Plaintiff and members of this Class.  As detailed more fully herein, there is an actual controversy as to whether Defendant Hartford Southeast's practice of failing to pay the full applicable sales tax for totaled autos would result in Defendant Hartford Southeast violating the policy, which promises to pay the full applicable sales tax for total loss claims paid in money.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the acts and course of conduct giving rise to the claims alleged occurred within the

District. Indeed, Defendants were engaged in the business of marketing and selling personal auto policies in the State of Connecticut, within this District.  Also, Defendants have their principal place of business in Connecticut. As such, the Defendants are subject to personal jurisdiction in this District.

## **THE PARTIES**

13.     Plaintiff Pearl Rodriguez, at all times material hereto, is and has been a citizen of Illinois, residing in Hazel Crest, Illinois.  On June 20, 2020, Plaintiff's 2007 Ford Focus, which she insured through a personal automobile insurance policy written by Defendant Trumbull, sustained physical damage in an accident.  Plaintiff filed a claim with Defendant Trumbull under the "Coverage for Damage to Your Auto" section of her Trumbull policy to fix the damage to her car.  Defendant Trumbull or John Does 1 through 21 acting as Trumbull's claim administrator, determined her claim was covered under this section of the policy and declared Plaintiff's car a total loss.  Defendant Trumbull made a payment on Plaintiff's total loss claim.  In calculating the payment for Plaintiff's total loss claim, Defendant Trumbull or John Does 1 through 21 acting as Trumbull's claim administrator, used the amount of value for Plaintiff's total loss vehicle specified in a Mitchell's Vehicle Valuation Report that applied PSA reductions to determine the value of Plaintiff's total loss vehicle.  As a result, Defendant Trumbull's payment to Plaintiff for her total loss claim did not include payment of the full ACV for the totaled 2007 Ford Focus.  The payment to Plaintiff also did not include any payment for sales tax, which is also promised by her Trumbull policy.

14.     Plaintiff currently insures a 2019 Nissan Rogue under a personal auto insurance policy written by Defendant Hartford Southeast.  *See* Exhibit 4.  This policy includes identical Limits of Liability provisions and sales tax provisions in its "Coverage for Damage to Your Auto" section to her Trumbull policy in effect at the time of the total loss of her 2007 Ford Focus.  Upon

information and belief, Defendants continue to direct Mitchell to apply PSA reductions to determine the value of the auto and then use that value as the basis to make a payment for covered total loss claims. Defendants also continue to not include the full applicable sales tax for covered total loss claims under the policy's "Coverage for Damage to Your Auto" section. As such, Plaintiff is concerned that, if her 2019 Nissan Rogue is declared a total loss under her Hartford Southeast policy, Defendants will again engage in their common scheme, resulting in the underpayment of total loss claims by not including the full ACV for the totaled auto and also not including payment for the full "applicable sales tax" as explicitly provided for in this policy.

15.     Defendant Trumbull is a wholly-owned subsidiary of The Hartford Financial Services Group, Inc. ("Hartford Financial"). Trumbull writes property and casualty lines of insurance, including personal automobile insurance policies like the ones issued to Plaintiff and the proposed Projected Sold Adjustment Class (defined herein) and Sales Tax Class (defined herein), in 49 states[4] and the District of Columbia. Trumbull is licensed to conduct business and is conducting business in those 49 states and the District of Columbia. Trumbull is a Connecticut company and shares its principal place of business with its parent, Hartford Financial, at One Hartford Plaza, Hartford, CT 06155.

16.     Defendant Hartford Southeast is also a wholly-owned subsidiary of Hartford Financial. Hartford Southeast writes property and casualty lines of insurance, including personal automobile insurance policies like the ones issued to Plaintiff and the proposed Declaratory Judgment Classes (defined herein), in 35 states[5] and the District of Columbia. Hartford Southeast

---

[4] The only state Trumbull does not write property and casualty insurance in is Hawaii. *See* https://www.thehartford.com/legal-notice.

[5] These states are: Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oklahoma, Oregon,

is licensed to conduct business and is conducting business in those 35 states and the District of Columbia. Hartford Southeast is a Connecticut company and shares its principal place of business with its parent, Hartford Financial, at One Hartford Plaza, Hartford, CT 06155.

### Hartford Financial and All of its Subsidiaries Operate Collectively and In Coordination with Each Other Under the Brand Name "The Hartford"

17.    Hartford Financial and all of its subsidiaries, including Defendants Trumbull and Hartford Southeast as well as 18 other insurance companies that write lines of property and casualty insurance, including personal automobile insurance policies, all operate under the brand name "The Hartford." As such, Hartford Financial and its subsidiaries all maintain the same website at https://www.thehartford.com/. Through this website, all insureds, including Plaintiff and the members of the Classes (defined herein), may access their online accounts related to their insurance policies underwritten by one of The Hartford entities.

18.    All employees of Hartford Financial and its subsidiaries, including those employee claims representatives that communicate with insureds regarding their total loss claims, have email addresses bearing a domain name of "thehartford.com".

19.    Upon information and belief, either Hartford Financial or one or more of Hartford Financial's subsidiaries operates "The Hartford Centralized Total Loss Center." Indeed, all settlement summaries sent to total loss claimants under policies underwritten by any of The Hartford entities state as follows in the top left corner of the first page:



THE HARTFORD
CENTRALIZED TOTAL LOSS CENTER
P.O. BOX 14264
LEXINGTON KY 40512

*See* Exhibit 3. Further, all settlement summaries sent to total loss insureds are signed by "The Hartford" claims representatives, which provides contact information for the claims representative.

---

Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and West Virginia. *See* https://www.thehartford.com/legal-notice.

Upon information and belief, the "Toll Free Number" and the "Fax" number printed in the claims representative signature block on every settlement summary is the same for all total loss claims submitted to any of The Hartford insurance companies.

20.    The Hartford Centralized Total Loss Center processes and administers all total loss claims submitted by insureds under their personal automobile insurance policies underwritten by any of The Hartford entities.  As such, The Hartford entity (or entities) that operates this Centralized Total Loss Center acts as the claim administrator for all The Hartford entities, including Defendants Trumbull and Hartford Southeast.  This claim administrator, in concert with The Hartford entities that underwrite the insurance policy under which a total loss claim is submitted, engage in a common policy or practice of directing its vendor, Mitchell, to apply PSA reductions when determining the value of a totaled auto, which, in turn, allows The Hartford entities to pay less than the full ACV of the totaled auto as required by The Hartford entities' standardized personal automobile policies.  The claim administrator, in concert with The Hartford entities that underwrite the insurance policy under which a total loss claim is submitted, also engage in a common policy or practice of failing to pay the full "applicable sales tax" as required by The Hartford entities' standardized personal automobile insurance policies.

21.    Currently, the identity of The Hartford entity or entities that acts as claim administrator(s) for all total loss claims submitted to The Hartford Centralized Total Loss Claim Center is/are unknown to Plaintiff.  As such, Plaintiff sues such claim administrator(s) under the fictitious names Defendants John Does 1 through 21. Plaintiff will amend her Complaint when she ascertains the true names and capacities of these Defendants.  Upon information and belief, discovery in this case will bear out which of The Hartford entities act as claim administrators and operate The Hartford Centralized Total Loss Center.  Indeed, there are various management and operations agreements in effect between The Hartford entities, which are not publicly available and

thus Plaintiff currently does not have access to, but which may be obtained through discovery.[6]

## FACTUAL ALLEGATIONS

I.    **DEFENDANTS' USE OF INVALID PROJECTED SOLD ADJUSTMENTS**

    A.    **The Standardized Auto Insurance Policy States The Company Will Pay the "Actual Cash Value" For Covered Total Loss Claims**

22.    Trumbull uses standardized personal auto insurance policies to issue auto insurance to insureds in at least 18 states[7] known to Plaintiff as of the filing of this Complaint through publicly available state policy form filings (and as many as all 49 states where it is approved to sell personal automobile insurance policies). This includes the policy it issued to Plaintiff in Illinois attached to this Complaint as Exhibit 1.

23.    Each standardized personal auto insurance policy Trumbull issues contains a "Coverage for Damage to Your Auto" section. This section outlines Trumbull's responsibilities regarding payment of loss claims submitted for physical damage lines of coverage, *i.e.*, collision coverage and "other than collision" coverage, commonly known in the auto insurance industry as comprehensive coverage and referred to herein as comprehensive coverage. This includes payment of total loss claims.

24.    In this section, Trumbull contains a "Limit of Liability" provision, which applies to payment of all covered total loss claims. This provision provides, in pertinent part:

**LIMIT OF LIABILITY**
A.  Our limit of liability for loss will be the lesser of the:
    1.  Actual cash value of the stolen or damaged property; or
    2.  Amount necessary to repair or replace the property with other property of like kind and quality.

---

[6] *See* https://portal.ct.gov/cid/-/media/cid/1_stipulation/fin-exam-hartford-fire-and-affiliates-dec2022.pdf (identifying the various agreements).

[7] These states are: Colorado, Connecticut, Delaware, Idaho, Illinois, Mississippi, Montana, Nebraska, New Mexico, North Dakota, Ohio, Pennsylvania, South Carolina, South Dakota, Texas, West Virginia, Wisconsin, and Wyoming.

Ex. 1 at p. 24 of 31.  All of the standardized personal auto insurance policies Trumbull issues in at least the 18 states listed above contain this provision.

25.    The Hartford Insurer Group insurers use the first option in paying out **_all_** total loss claims.  Indeed, The Hartford's website states: "If you have collision and comprehensive coverage, your insurance company will pay you the actual cash value of your car if it's totaled."[8]  Consistent with that, the Settlement Statement provided to Plaintiff for her total loss claim states that Trumbull is purportedly paying the "Actual Cash Value" of her totaled auto less her deductible. *See* Exhibit 3.

26.    Accordingly, Trumbull's policies explicitly promise to pay the Actual Cash Value of the totaled car for covered total loss claims under the policies' "Coverage for Damage to Your Auto" section and its uniform practice is to pay the ACV for the totaled auto for covered total loss claims.

### B.   Defendants' Uniform Total Loss Settlement Process For Determining and Underpaying the Actual Cash Value of Totaled Autos for Covered Total Loss Claims

27.    Despite the policy's promise to pay the Actual Cash Value of the totaled auto for covered total loss claims, the common and uniform total loss settlement process Trumbull and the other The Hartford insurers employ to pay these claims, through their claims administrator, John Does 1 through 21 causes Trumbull and the other The Hartford insurers to not pay the full ACV for covered total loss claims.

28.    Defendants use a third-party vendor, Mitchell, to determine the Actual Cash Value of totaled autos.  They do this by requesting that Mitchell prepare a report called a Vehicle Valuation Report for the totaled auto.  Upon information and belief, Defendants John Does 1 through 21 make all such requests on behalf of all The Hartford insurers because Defendants John

---

[8] https://www.thehartford.com/aarp/car-insurance/total-loss-car-insurance.

Does 1 through 21 administer all total loss claims submitted to these insurers, including those submitted to Trumbull, at The Hartford Centralized Total Loss Center.

29.     The Vehicle Valuation Report calculates the Actual Cash Value of a totaled auto by engaging in a five-part process.  First, the Report finds autos for sale that are similar to the totaled auto in the total loss claimants' geographic location.  These similar autos are called "comparable vehicles" in the Report.  Second, the Report takes the sales price listed for each comparable vehicle used and adjusts it either up or down based on three different adjustments to come up with an "adjusted price" for the totaled auto.  The first adjustment, called the mileage adjustment, is applied to account for documented differences in mileage between the comparable vehicle and the totaled auto.  The second adjustment, called an equipment adjustment, is applied to documented differences in trim options, accessories and safety features offered by the comparable vehicle and the totaled auto.  The third adjustment, known as a "Projected Sold Adjustment" or "PSA", is also applied.  However, unlike the mileage and equipment adjustments, the Projected Sold Adjustments are not based on any documented differences between the comparable vehicle and the totaled auto and consistently result in a downward adjustment of the amount of value of the total loss vehicle.  In fact, as discussed more fully below, Defendants provide no clear rationale for applying Projected Sold Adjustment to each comparable vehicle since this adjustment does not in any way account for actual differences between the comparable vehicle and the totaled auto.  Nonetheless, the mileage adjustment, equipment adjustment (if applicable), and the PSAs are factored together to create an "adjusted price" for each comparable vehicle, as depicted below:



*See* Exhibit 2 at p. 6.

30.    After the Report creates an "adjusted price" for each comparable vehicle, the Report averages the adjusted prices to determine the base value for the totaled auto. From there, the Report then applies several other adjustments, collectively known as "loss vehicle adjustments", to the base value to calculate the "market value" for the totaled auto.  On the first page of each Report, the "market value" is shown as being calculated in materially the same manner as follows:



*See* Exhibit 2 at p. 1.

31.    Defendants use this "market value" generated by the Report and designate this figure as the "Actual Cash Value" of the totaled auto on the uniform written total loss settlement statements they send to insureds.  Defendants' uniform written total loss settlement statements, sent via The Hartford Centralized Total Loss Center, provide the insured with an itemized breakdown of Defendants' settlement value for the totaled vehicle.  Thus, Defendants rely on the Report they direct Mitchell to generate to determine the ACV of insureds' totaled autos.  Defendants even attach

the Report to the written total loss settlement statements they send to insureds and state in the form statement: "To determine the 'Actual Cash Value' figure listed above, we reviewed available information, including the enclosed Vehicle Evaluation Report.  This report is one tool that we use to assist us in determining your vehicle's value . . . . The comparable vehicles identified from the database served as the basis for the value assigned in the Vehicle Evaluation Report, after accounting for differences on items such as mileage."  *See* Exhibit 3 at p. 1 (Plaintiff's written total loss settlement statement).

32.    Indeed, as shown by the written settlement statement Plaintiff received from Defendants via The Hartford Total Loss Settlement Center attached as Exhibit 3, the "Actual Cash Value" for her totaled 2007 Ford Focus matches the "market value" assigned by the Mitchell's Vehicle Valuation Report generated for this totaled auto:

| Plaintiff's Written Settlement Statement from The Hartford Centralized Total Loss Center | Plaintiff's Vehicle Valuation Report Generated By Mitchell | |
|---|---|---|
| Actual Cash Value: (+) $2,095.78 | Loss Vehicle Adjustments | |
| Sales Tax: (+) $0.00 | Adjustments specific to your vehicle | |
| Unrelated Prior Damage: (-) $0.00 | Base Value = | $2,215.17 |
| Sub Total: $2,095.78 | Condition - | $194.39 |
| Total Fees: (+) $0.00 | Prior Damage | $0.00 |
| Deductible: (-) $500.00 | Aftermarket Parts + | $75.00 |
| Net Total: $1,595.78 | Refurbishment | $0.00 |
| | Market Value = | $2,095.78 |

*Compare* Exhibit 3 at p. 1, *with* Exhibit 2 at p. 1.

33.    Plaintiff is not challenging application of mileage, equipment or loss vehicle adjustments in this lawsuit because these adjustments align with used car marketing and inventory industry standards and account for differences that actually impact the value of an auto.  Indeed, it is common knowledge that an auto with less miles on it is more valuable than an auto with more

miles on it, with everything else being equal. Similarly, an auto with more accessories or additional safety features is more valuable than the same car without those accessories or safety features, with everything else being equal.  Having prior damage, aftermarket parts or refurbished parts on an auto makes the auto less valuable than an auto with no prior damage, aftermarket parts or refurbished parts, with everything else being equal.

34.    However, Plaintiff is challenging Defendants' use of PSAs as a matter of law to calculate the Actual Cash Value of the totaled auto because it is not based on documented differences between the comparable vehicle and totaled auto.  Significantly, application of PSAs appears to consistently result in a downward adjustment to each comparable auto.  This, in turn, results in claimants such as Plaintiff and members of the Projected Sold Adjustment Class and the Projected Sold Adjustment Claims Administrator Class to not be paid the full ACV for the totaled auto as promised by their policies.

35.    Stated differently, Defendants provide no data to justify their use of **_any_** PSA whatsoever, let alone the downward PSAs systematically applied in Plaintiff's and other members of the Projected Sold Adjustment Class and the Projected Sold Adjustment Claims Administrator Class Vehicle Valuation Reports.  The **_only_** explanation for using PSAs is a vague statement buried in Plaintiff's Vehicle Valuation Report. Exhibit 2 at p. 8. It states in full: "Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." *Id.* This statement does not explain what verifiable and documented data is being used to consistently apply negative PSAs to reduce the value of the totaled auto, let alone the specific amount of downward adjustment used. Nor could they since application of PSAs defy market realities as well as automobile dealer pricing and inventory management practices.

### C.  Defendants' PSAs are Invalid, Arbitrary and Baseless

36.    PSAs are invalid because they assume that a consumer who is buying a car will negotiate the advertised price down so that the actual purchase price they pay is lower than the

advertised price. This assumption is outdated and at odds with how consumers currently buy autos in the age of online shopping.

37.     Before the ubiquity of the Internet, advertised auto prices had very little to do with eliciting car buyers to a specific dealership.  Rather, car buyers typically went to their local used car dealership to purchase vehicles.[9]  At the time, they did not have a quick and easy way to comparison shop between dealerships to get the car they wanted for the lowest price. Lack of access to consumer resources that aided in comparison shopping among dealerships decreased competition,[10] allowing dealerships to set advertised prices without considering what their competitors were charging for a similar car.[11]

38.     As a result, dealerships generally set the advertised auto prices above market price knowing that some consumers might be poor negotiators and pay an inflated price for the car.  This, in turn, would result in the dealership realizing inflated profits from those sales.  However, the norm used to be that consumers and dealerships would haggle about the above-market advertised price, typically resulting in a lower sales price.[12]

---

[9] https://www.easterns.com/2021/04/16/buying-car-online-changed-auto-industry/#:~:text=Back%20in%20the%20pre%2Dinternet%20years%2C%20used%20car,suffere d%20flood%20damage%20or%20was%20otherwise%20compromised.&text=Pre%2Dinternet%2 0car%20shopping%20usually%20meant%20driving%20around,town%20to%20find%20out%20a bout%20their%20selection.

[10] https://www.forbes.com/sites/forbesdallascouncil/2018/07/24/from-traditional-to-digital-how-the-internet-has-revolutionized-the-car-buying-process/.

[11] https://www.usatoday.com/story/money/cars/2012/12/06/car-shopping-prices-roundtable/1749101/.

[12] *Id. See also* https://dealerservices.covideo.com/blog/no-haggle-car-buying/ ("For some buyers, the age-old tradition of negotiating their price at a dealership has begun to lose its luster. Consumers have a world of information at their fingertips paired with nearly unlimited online buying options, which has made them prioritize transparency . . . . No-haggle car buying reflects evolving consumer preferences and expectations in the automotive industry."); https://money.com/haggling-car-dealership-is-disappearing/ ("Overall, haggling at the car dealership has simply faded ever since

39.     In the age of the Internet, this is no longer how the user car market works.  Now, consumers have access to extensive information about car sales across many different dealerships at their fingertips.  This allows consumers to easily compare the advertised prices of similar vehicles.  Because consumers can more easily comparison shop, competition among dealerships increased and dealerships rarely, if ever, list advertised car prices above market.  If they did, consumers would simply choose another dealership to buy the car they want.  Instead, used car dealerships rely on sophisticated software to price their vehicles.  Reliance on such software causes used car dealerships to price their vehicles at market price.  As such, downward negotiations from the advertised price are no longer the norm.  Thus, use of PSAs to account for a routine "downward negotiation" of the advertised price of a vehicle no longer fits market norms or industry standards.[13]

40.     This is especially true during the height of the COVID-19 pandemic when used cars were scarce and, as a result, dealerships routinely sold cars above the advertised price without any

---

supply shortages emerged in the auto industry in 2021. Car dealerships generally aren't under much pressure to move vehicles by offering discounts or engaging in negotiations with customers because their cars are still selling fast for around the full price or more.").

[13] *See, e.g.,* https://www.coxautoinc.com/learning-center/2019-car-buyer-journey-study/ (2019 car buying study stating that more car buyers make car purchasing decisions using the Internet ahead of time, which requires dealers to "have a strategy to help buyers get to 'yes' online[]"); https://dealerservices.covideo.com/blog/no-haggle-car-buying/ ("For some buyers, the age-old tradition of negotiating their price at a dealership has begun to lose its luster. Consumers have a world of information at their fingertips paired with nearly unlimited online buying options, which has made them prioritize transparency . . . . No-haggle car buying reflects evolving consumer preferences and expectations in the automotive industry."); https://money.com/haggling-car-dealership-is-disappearing/ ("Overall, haggling at the car dealership has simply faded ever since supply shortages emerged in the auto industry in 2021. Car dealerships generally aren't under much pressure to move vehicles by offering discounts or engaging in negotiations with customers because their cars are still selling fast for around the full price or more."); https://www.forbes.com/sites/dalebuss/2021/09/21/online-creates-trust-in-car-dealers-by-young-consumers-study-says/ ("Young consumers are more likely to trust the auto-sales process the more that it moves online."). *Cf.* https://www.digitaltrends.com/cars/harris-poll-survey-consumer-automotive-index-beepi-frustration/ (summarizing results of a 2016 study finding that "of parents with children under 18, 80 percent 'would rather do anything else unpleasant than negotiate with a dealership salesperson.'").

downward negotiation.  Indeed, during this time – when Plaintiff experienced her total loss -, consumers would frequently engage in bidding wars, resulting in dealerships being able to sell used cars well above their listed advertised price.[14]

41.    Inclusion of PSAs resulting in a significant downward adjustment to purportedly "reflect consumer purchasing behavior" is particularly improper when consumer-insureds like Plaintiff and the members of the Classes experience total losses and need to replace their vehicles. They have limited time to search for a new-to-them replacement car that is offered in a below-market deal, which Defendants assume without evidence, and contrary to market conditions, always exists.

42.    Defendants' PSAs also contradict appraisal standards. Appraisal standards require adjustments to price to be based on documented and verifiable differences between the total loss auto and the comparable vehicle.  For example, the 2024 Uniform Standards of Professional Appraisal Practice ("USPAP"), which "represents the generally accepted and recognized standards of appraisal practice in the United States", *see* USPAP at p. vii, and which some automotive appraisal organizations recognize and follow, https://autoappraisalnetwork.com/classic-car-valuation-tips/franchise-automobile-1525704014.html, requires appraisers to keep "all [] data, information and documentation necessary to support the appraiser's opinions and conclusions and to show compliance with USPAP, or references to the location(s) of such other data, information, and documentation" in the work file for each appraisal or appraisal review assignment.  *See* USPAP, Record Keeping Rule, at p. 12. The USPAP also requires appraisers to generate reports that contain

---

[14] *See, e.g.,* https://web.archive.org/web/20240707053541/https://www.kbb.com/car-news/dealers-paying-more-for-used-cars-prices-likely-to-rise-again/ (used car prices increased by 27% over the calendar year in 2020); https://www.capitalone.com/cars/learn/finding-the-right-car/why-usedcar-prices-are-finally-dropping/2697 (explaining why the prices of used cars rose during the COVID-19 pandemic).

"sufficient information to allow the client and other intended users to understand the scope of the work performed" and prohibits them from "caus[ing] the assignment results to be biased" or allowing assignment conditions to cause assignment results that are not credible in the context of their intended use. *Id.*, Scope of Work Rule, at p. 16. With regard to personal property appraisals, such as of appraisals of private passenger automobiles, the USPAP requires appraisers to "not commit substantial error of omission or commission that significantly affects an appraisal", "not render appraisal services in a careless or negligent manner", and "identify, from sources the appraiser reasonably believes to be reliable, the characteristics of the property that are relevant to the type and definition of value and the intended use of appraisal". *Id.,* Standard Rules 7-1 and 7-2, at pp. 45-46.  Specifically, "[i]n developing a personal property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results" and "reconcile the quality and quantity of data available and analyzed within the approach or approaches used." *Id.,* Standard Rules 7-4 and 7-6, at pp. 47-48.  All personal property appraisal reports must "clearly and accurately set forth the appraisal in a manner that will not be misleading", "contain sufficient information to enable the intended user(s) of the appraisal to understand the report properly", and "summariz[e] the information analyzed and the reasoning that supports the analyses, opinions, and conclusions, including reconciliation of the data and approaches".  *Id.,* Standard Rules 8-1 and 8-2, at pp. 49-50. The Vehicle Valuation Reports Defendants Trumbull and Hartford Southeast, through their claims administrator, Defendant John Does 1 through 21 direct Mitchell to generate do not state the data relied upon for use of the PSAs and do not sufficiently explain the reason for the use of the PSAs to the intended users (*i.e*., the total loss claimants such as Plaintiff and other members of the Classes).  Accordingly, use of the PSAs in the manner applied here violates the USPAP.  Similarly, use of the PSAs is not expressly permitted by some states' appraisal of total loss laws. *See, e.g.,* Ill. Admin. Code tit. 50, § 919.80(c).

43.     Stated simply, the PSAs are based on undocumented and unverifiable assumptions, which as detailed above, are inconsistent with market realities and uniform appraisal standards.

44.     Defendants likewise thumb the scale in favor of themselves by systematically applying the PSAs to reduce claim payouts to the detriment of the insureds by failing to account for variables that influence sales prices.  For example, a consumer may trade-in the car as part of the sales transaction or purchase an extended warranty or service plan.  These may reduce the ultimate sales price of a car because the consumer is providing the dealership with an additional benefit (*i.e*., another car to sell or more money from the ancillary service plan sale) but would not impact the ACV of the car itself.

45.     Further, upon information and belief, until at least July 2021, Defendants, through Mitchell, excluded from its data sets all comparable vehicles where the advertised list price of the vehicle equaled or was less than the sold price. Defendants only used data for comparable vehicles where the sold price was less than the advertised list price in the Vehicle Valuation Reports used to calculate the ACV of the total loss auto. In other words, Defendants, through Mitchell, used scraped and manipulated data in an attempt to justify applying PSAs to pay insureds less than ACV for their total loss autos.

46.     The impropriety, baselessness, and arbitrariness of Defendants' systematic application of PSAs is further demonstrated by the fact that Mitchell's primary competitor in providing Vehicle Valuation Reports to insurers – CCC Intelligent Solutions, Inc. – does not apply PSAs.  Rather, CCC Intelligent Solutions, Inc. uses advertised list prices to calculate the ACV of totaled autos.  Yet, Defendants knowingly use Mitchell to run the Vehicle Valuation Reports they rely on to artificially understate the ACV of insureds' totaled autos.

47.     Plaintiff and each member of the Projected Sold Adjustment Class and the Projected Sold Adjustment Claims Administrator Class were damaged by Defendants' uniform and

systematic use of PSAs because Defendants did not pay them the ACV promised under their policies and that they would have received had Defendants used proper appraisal standards and methodologies that reflect market realities to calculate the value of their totaled autos.

48.     Were it not for Defendants' use of these PSAs, the "base value" of each comparable vehicle used to determine the value of Plaintiff and each member of the Projected Sold Adjustment Class and Projected Sold Adjustment Claims Administrator Class would be higher, which would result in a higher "settlement value" and payment of the full ACV owed under the policies. Plaintiff's experiences highlight this fact and shed light on how Trumbull and its claims administrator, Defendants John Does 1 through 21 wrongly pocket money owed to Plaintiff and other members of the Projected Sold Adjustment and Projected Sold Adjustment Claims Administrator Classes under their policies.

### D.  Plaintiff's Experience

49.     On June 20, 2020, Plaintiff Pearl Rodriguez's car was involved in an accident and sustained physical damage.

50.     Following the accident, Plaintiff made a property damage claim to her insurer, Trumbull.

51.     Trumbull declared Plaintiff's auto a total loss.  Trumbull provided her with a "Vehicle Valuation Report" generated from a third-party vendor, Mitchell, attached as Exhibit 2. Trumbull used this Report to determine the ACV for Plaintiff's totaled car, and, thus, the settlement payment amount to be paid under the terms of the policy for the totaled car.

52.     On Plaintiff's Report from Mitchell, the PSA applied to each of five comparable cars used in the Report resulted in a downward adjustment of the "adjusted value" of each comparable vehicle by $525.00, $394.00, $460.00, $414.00, and $393.00, respectively, and a "Market Value" for Plaintiff's total loss auto of $2,095.78. *See* Exhibit 2 at pp. 1, 3, 5-7. Defendants applied and relied on these figures to improperly conclude that the ACV owed to Plaintiff was only

$2,095.78. *Compare id., with* Exhibit 3.  After Plaintiff's deductible was subtracted from this ACV

calculation in accord with her policy, Trumbull, either directly or indirectly through its claims

administrator, Defendants John Does 1thorough 21 paid Plaintiff $1,595.78 for her first-party total

loss claim. Exhibit 3.

      53.    Had Trumbull and/or its claims administrator, Defendants John Does 1 through 21

through Mitchell, not applied or relied upon these improper PSA reductions, the ACV of Plaintiff's

vehicle would be $437.60 higher[15] before adding the related increase for payment of the applicable

sales tax, which Defendants also fail to do as set forth below. This higher amount represents the

full ACV Trumbull owes Plaintiff for her total loss claim under her policy.  These practices are not

unique to Plaintiff's total loss claim since all total loss claims submitted to any The Hartford insurer

purports to pay ACV for the total loss vehicle under the policy and is handled by Defendants John

Does 1 through 21 via The Hartford Centralized Total Loss Center. Upon information and belief,

Defendants employ the same practice and procedure to artificially reduce its total loss payments

and cheat other members of the Classes out of the money owed to them under their policies.

## II.    DEFENDANTS' FAILURE TO PAY SALES TAX ON TOTAL LOSS CLAIMS

###     A.  The Standardized Auto Insurance Policy Expressly States The Company Will Pay "the Applicable Sales Tax" As Part of the Payment for a Total Loss Claim

      54.    Additionally, in every standardized personal automobile insurance policy Trumbull

issues, Trumbull expressly promises in the "Coverage for Damage to Your Auto" section: "If **we**

pay for loss in money, our payment will include the applicable sales tax for the damaged or stolen

property." *See* Exhibit 1 at p. 24 of 31.  This promise applies to payments for covered total losses.

      55.    Consequently, Trumbull's standardized auto policies expressly require Trumbull to

pay the lesser of either the ACV of the totaled auto or the amount necessary to replace the totaled

auto **_and to also specifically include payment for_** the "applicable sales tax" for the totaled auto as

---

[15] $437.60 is the average of the PSAs applied to the five comparable vehicles in the Vehicle
Valuation Report Defendants Trumbull and John Does 1 through 21 issued to Plaintiff.

part of that payment when paying ***all*** total loss claims.

**B. Trumbull Fails to Pay the Applicable Sales Tax As Promised in its Policies for Totaled Autos**

56.    Despite Trumbull's standardized policies expressly stating that it will pay the "applicable sales tax" as part of total loss claim payments, Trumbull routinely fails to do so on autos Defendants declare total losses.

57.    In fact, Trumbull routinely pays no sales tax ***at all*** for some totaled autos.  Plaintiff's experiences highlight this fact and shed light on how Trumbull and its claims administrator, Defendants John Does 1 through 21 work together to systematically and artificially reduce insureds' total loss payments, allowing Trumbull to pocket the money it owes for sales tax on totaled autos.

**C. Plaintiff's Experiences**

58.    Plaintiff insured a 2007 Ford Focus on her Trumbull personal automobile insurance policy.  On June 20, 2020, while insured under Plaintiff's Trumbull policy, the 2007 Ford Focus sustained physical damage in a car wreck. At the time of the car wreck, Plaintiff had both collision coverage and comprehensive (other than collision) coverages for the 2007 Ford Focus.

59.    As such, Plaintiff subsequently submitted a claim for the physical damage to her 2007 Ford Focus under the policy's "Coverage for Damage to Your Auto" section to Defendants. This policy section covers physical damage loss claims where the insured has coverage or comprehensive (other than collision) coverages on their policy.

60.    As stated above, this policy section promises that, if a claim for loss is approved and paid in money, the "applicable sales tax" for the damaged or stolen property (*i.e.*, the auto) will be included as part of the claim payment. *See* Ex. 1 at p. 24 of 31.

61.    Defendants approved Plaintiffs' claim and deemed the 2007 Ford Focus to be a total loss under the policy.

62.    On June 25, 2020, Defendants issued Plaintiff a settlement summary from The Hartford Centralized Total Loss Center, which provides "an itemized breakdown of our settlement

value regarding [her] 2007 Ford Focus." *See* Exhibit 3 at p. 1.  In this settlement statement, Defendants list the amount of sales tax to be paid as part of the claim payment as "$0.00" as depicted below:

Actual Cash Value: (+) $2,095.78
Sales Tax: (+) $0.00
Unrelated Prior Damage: (-) $0.00
Sub Total: $2,095.78
Total Fees: (+) $0.00
Deductible: (-) $500.00
Net Total: $1,595.78

*Id.* (emphasis added).

63.     After receiving this document, Plaintiff completed and returned the required paperwork so that her total loss claim payment could be issued.

64.     Defendants subsequently paid Plaintiff the "Net Total" amount listed in the settlement summary she received as the claim payment.  This payment did not include the payment for the "applicable sales tax" for her totaled 2007 Ford Focus as promised under the explicit terms of her Trumbull policy.

65.     To date, Plaintiff has never received payment from Defendants for the sales tax owed for her totaled 2007 Ford Focus even though her Trumbull policy expressly states that Trumbull will pay the applicable sales tax on the damaged or stolen property.

66.     Trumbull tacitly acknowledges that failure to pay sales tax as part of the total loss claim payment violates the policy because Trumbull, either directly or through claims administrator Defendant John Does 1 through 21 directs Mitchell to calculate the sales tax owed in the Vehicle Valuation Report.  For example, Plaintiff's Vehicle Valuation Report shows that Defendants owe her $151.94 in sales tax for payment of her claim:



Exhibit 2 at p. 1. Yet, Defendants willfully ignored this calculation when they issued their total loss settlement statement to Plaintiff, representing to Plaintiff that they owed $0.00 to her for sales tax. *See* Exhibit 3. Defendants' failure to rely on this part of the Mitchell report while, at the same time, relying on the PSAs that resulted in lower value for the total loss auto, shows Defendants use every opportunity they can to pocket money they owe to insureds and to keep the money for themselves.

67. These practices are not unique to Plaintiff's total loss claim. Indeed, all first-party total loss claims submitted to any The Hartford insurer are under policies issued by insurers operating under "The Hartford" brand that require payment of sales tax on the ACV of total loss vehicles. Moreover, the administration of those claims is handled by Defendants John Does 1 through 21 via The Hartford Centralized Total Loss Center. Upon information and belief, Defendants employ the same practice and procedure to cheat other members of the Sales Tax and Sales Tax Claims Administrator Classes out of some or all of the money for sales tax owed to them under their policies.

## III.    DEFENDANTS' CONDUCT CAUSING SYSTEMATIC BREACHES OF THEIR UNIFORM POLICY PROVISIONS IS ONGOING

68.    Defendants use and continue to use a uniform plan and practice, as described throughout this Complaint, that causes members of the Classes' The Hartford policies to be routinely breached. As a result of this systematic breach, members of the Classes do not receive the full monetary benefits of their auto policies.

69.    Plaintiff currently insures a 2019 Nissan Rogue under a personal auto insurance policy written by Defendant Hartford Southeast.  *See* Exhibit 4 (Hartford Southeast Policy); Exhibit 5 (Plaintiff's current Hartford Southeast declarations page of policy).  This policy includes identical "Limit of Liability" provisions and sales tax provisions in its "Coverage for Damage to Your Auto" section to those in her Trumbull policy in effect at the time of the total loss of her 2007 Ford Focus. *Compare* Exhibit 4 at p. 12 of 15, *with* Exhibit 1 at p. 24 of 31. Additionally, others insured by Hartford Southeast in at least 22 states based on the publicly available filings for polices (and as many as all 35 states in which Hartford Southeast issues personal automobile insurance policies) have identical or materially the same Limit of Liability and sales tax provisions in their policies.[16]

70.    Upon information and belief, Defendants continue to direct Mitchell to apply PSA reductions to determine the value of the auto and then use that value as the basis to make a payment for covered total loss claims.  Defendants also continue to not include the full applicable sales tax for covered total loss claims under the policy's "Coverage for Damage to Your Auto" section.  As such, Plaintiff is concerned that, if her 2019 Nissan Rogue is declared a total loss under her Hartford Southeast policy, Defendants will again engage in their common scheme, resulting in the underpayment of total loss claims by not including the full ACV for the totaled auto and also not

---

[16]  These states are: Arkansas, Arizona, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Missouri, Mississippi, Nebraska, New Mexico, Nevada, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, Vermont, Washington, and West Virginia.

including payment for the full "applicable sales tax" as explicitly provided for in this policy.

71.    To prevent future systematic breaches of Hartford Southeast's standardized personal auto insurance policy, a declaration of rights under the policy is necessary as there is an actual case or controversy concerning the parties' rights and obligations under the contract.

## CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action seeking certification of the Classes, defined below, (collectively, "Classes") pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), (b)(3) and/or (c)(4), as may be deemed appropriate by the Court.

73.    Plaintiff brings this action, individually and on behalf of all other persons similarly situated, more specifically defined as follows:

**Projected Sold Adjustment Class:** All persons insured by a personal automobile insurance policy with comprehensive or collision coverage issued by TRUMBULL INSURANCE COMPANY ("Trumbull") in the United States that contains the same or materially the same policy provisions that Trumbull will pay the Actual Cash Value for the stolen or damaged property (i.e., the auto), who, within the applicable statute of limitations, made a first-party claim to Trumbull for a total loss of their covered auto under the policy's comprehensive or collision provisions, whose auto was declared a total loss, and where a Mitchell International Inc. Vehicle Valuation Report that applied Projected Sold Adjustments to determine the value of the auto declared a total loss was used by Trumbull to determine the monetary amount it paid for the claim.

**Projected Sold Adjustment Claims Administrator Class:** All persons insured by a personal automobile policy issued by a Hartford Insurer Group insurer in the United States, including TRUMBULL INSURANCE COMPANY ("Trumbull"), HARTFORD INSURANCE COMPANY OF THE SOUTHEAST ("Hartford Southeast") and JOHN DOES 1 through 21 that contains the same or materially the same policy provisions that the insurer will pay the Actual Cash Value for the stolen or damaged property (i.e., the auto), who, within the applicable statute of limitations, made a first-party claim to a Hartford Insurer Group insurer for a total loss of their covered auto under the policy's comprehensive or collision provisions, whose auto was declared a total loss, whose first-party loss claim was administered by JOHN DOES 1 through 21 and where a Mitchell International Inc. Vehicle Valuation Report that applied Projected Sold Adjustments to determine the value of the auto declared a total loss was used by a Hartford Insurer Group insurer to determine the monetary amount it paid for the claim.

**Projected Sold Adjustment Declaratory Judgment Class:** All persons who currently have a personal automobile insurance policy with comprehensive or

collision coverage issued by HARTFORD INSURANCE COMPANY OF THE SOUTHEAST ("Hartford Southeast") in the United States that contain the same or materially the same policy provision stating that Hartford Southeast will pay the Actual Cash Value for the stolen or damaged property (i.e., the auto) declared a total loss.

**Sales Tax Class:**  All persons insured by a personal automobile insurance policy with comprehensive or collision coverage issued by TRUMBULL INSURANCE COMPANY ("Trumbull") in the United States that contains the same or materially the same policy provisions stating that Trumbull will pay the "applicable sales tax" for the damaged or stolen auto declared a total loss, who, within the applicable statute of limitations, made a first-party claim to Trumbull for a total loss of their covered auto under the policy's comprehensive or collision provisions, whose auto was declared a total loss, and the monetary payment for the total loss claim did not include the full applicable sales tax.

**Sales Tax Claims Administrator Class:**  All persons insured by a personal automobile policy issued by a Hartford Insurer Group insurer in the United States, including TRUMBULL INSURANCE COMPANY ("Trumbull"), HARTFORD INSURANCE COMPANY OF THE SOUTHEAST ("Hartford Southeast") and JOHN DOES 1 through 21 that contains the same or materially the same policy provisions stating that the insurer will pay the "applicable sales tax" for the damaged or stolen auto declared a total loss, who, within the applicable statute of limitations, made a first-party claim to a Hartford Insurer Group insurer for the total loss of their covered auto under the policy's comprehensive or collision provisions, whose first-party loss claim was administered by JOHN DOES 1 through 21 whose auto was declared a total loss, and the monetary payment for the total loss claim did not include the full applicable sales tax.

**Sales Tax Declaratory Judgment Class:**  All persons who currently have a personal automobile insurance policy with comprehensive or collision coverage issued by HARTFORD INSURANCE COMPANY OF THE SOUTHEAST ("Hartford Southeast") in the United States that contain the same or materially the same policy provision stating that Hartford Southeast will pay the "applicable sales tax" for the damaged or stolen automobile declared a total loss.

74.    Plaintiff reserves the right to modify or amend the definitions of any or all of the Classes, including limiting the Classes to multistate or statewide only, upon completion of discovery.

75.    Moreover, the Court can define the Classes and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the members of the Classes if the need arises based on discovery of additional facts.

76.     Excluded from the Classes are: (i) Defendants, their officers, employees, agents and affiliates, their subsidiaries, legal representatives, heirs, successors and assigns, (ii.) any of Plaintiff's counsel, their officers, employees, agents, legal representatives, heirs, successors, and assigns, (iii.) the judges assigned to this action and any of their immediate family members, and (iv.) claims against a Hartford Insurer Group insurer that were released, settled or otherwise precluded by a final judgment in a class action filed in a state or federal court in the United States.

77.     **Numerosity.** The members of the Classes are so numerous and are geographically dispersed throughout at least 18 states in the United States such that joinder of all members is impracticable.

78.     The precise numbers of the members of the Classes are unknown to Plaintiff at this time.  However, Plaintiff believes that, because Trumbull and Hartford Southeast write millions of dollars of private-passenger physical damage coverage premiums each year in at least 18 and 22 states, respectively, the persons affected by Defendants' unlawful practices consists of thousands of individuals.  Members of the Classes can be easily identified from Defendants' records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

79.     **Typicality.**  Plaintiff's claims are typical of those of the other members of the Sales Tax and the Sales Tax Claims Administrator Classes because (a) she insured an auto under a personal auto insurance policy issued by Trumbull, a Hartford Insurer Group insurer, which included comprehensive and collision coverages, (b) her policy expressly stated the insurer would pay the "applicable sales tax" for a loss to a damaged or stolen auto covered by comprehensive or collision loss coverages if it made a payment for the loss in money, (c) she made a loss claim for her auto under her insurance policy's comprehensive or collision coverage provisions, (d) John Does 1 through 21 administered her total loss claim, (e) her auto was declared a total loss as a result

of making the loss claim, (f) her total loss claim was paid in money, (g) payment of her claim did not include the applicable sales tax for the totaled auto.

80.     Plaintiff's claims are typical of those of the other members of the Projected Sold Adjustment and the Projected Sold Adjustment Claims Administrator Classes because (a) she insured an auto under a personal auto insurance policy issued by Trumbull, which included comprehensive and collision coverages, (b) she made a loss claim for her auto under her insurance policy's comprehensive or collision coverage provisions, (c) her auto was declared a total loss as a result of making the loss claim, (d) her total loss claim was administered at "The Hartford Centralized Total Loss Center" by one or more of the Hartford Insurer Group insurers, now known to Plaintiff as John Does 1 through 21 (d) Trumbull and her claims administrator, John Does 1 through 21 used a Mitchell Vehicle Valuation Report, in which PSAs were used to determine the value of her totaled car, and (e) application of the PSAs to determine the value of her totaled car resulted in Trumbull not paying her the full ACV of her totaled car in violation of the uniform provisions of the policy.

81.     Plaintiff's claims are typical of the Sales Tax Declaratory Judgment and the Projected Sold Adjustment Declaratory Judgment Classes because (a) she currently insures an auto on a personal automobile insurance policy issued by Hartford Southeast, (b) her Hartford Southeast policy, like other members of the Sales Tax Declaratory Judgment Class, states that, "If we pay for loss in money, our payment will include the applicable sales tax for the damaged or stolen property[]", and (c) her Hartford Southeast policy, like other members of the Projected Sold Adjustment Declaratory Judgment Class, further states that, the Limit of Liability for covered loss claims under the comprehensive or collision provisions of the policy would be the lesser of "[a]ctual cash value of the stolen or damaged property" or the "[a]mount necessary to repair or replace the property with other property of like kind and quality."

82.     Further, the material and relevant policy terms for each member of the Classes are identical to or materially the same as the terms of Plaintiff's policy, as are the written settlement statements and Mitchell Vehicle Valuation Reports Defendants sent to Plaintiff and members of the Classes.  As detailed above, Plaintiff's and members of the Classes' legal claims arise from the same core circumstances, practices and conduct, namely, a personal auto insurance policy issued or administered by Defendants that expressly states Defendants will pay the ACV for the stolen or damaged auto as part of a loss claim submitted and approved pursuant to the policy's collision or comprehensive coverage provisions and the insurance company's subsequent failure to pay the full ACV for autos declared a total loss in accord with the policy provisions.  Plaintiff suffered the same common core harm as all the other members of the Classes she seeks to represent.  Plaintiff's and members of the Classes' legal claims also arise from the same core circumstances, practices and conduct, namely, a personal auto insurance policy issued or administered by Defendants that expressly states Defendants will pay the "applicable sales tax" as part of a loss claim submitted and approved pursuant to the policy's collision or comprehensive coverage provisions and the insurance company's subsequent failure to pay the full applicable sales tax for autos declared a total loss in accord with the policy provisions.  Plaintiff suffered the same common core harm as all the other members of the Classes she seeks to represent.  Accordingly, certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

83.     Plaintiff's interests are coincident with and not antagonistic to those of other members of the Classes, nor is the Plaintiff subject to any unique defenses.

84.     **Adequacy.** Plaintiff and her counsel will fairly and adequately protect and represent the interests of each member of the Classes. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in prosecuting class actions and

particularly insurance class actions on behalf of insureds. Plaintiff's counsel has successfully litigated other class action cases similar to the instant action: where insurers breached their contracts with insureds as part of total loss claim settlements by failing to pay the full amount for the total loss auto as required by the insurance contract.

85.    **Commonality and Predominance.**  Plaintiff's claims raise questions of law and fact common to all members of the Classes, within the meaning of Fed. R. Civ. P. 23(a)(2), and they predominate over any questions affecting only individual members of the Classes within the meaning of Rule 23(b)(3).  The central issues in this litigation turn on interpretation of identical or materially similar policy provisions contained in standard form policy contracts and Defendants systemic practice of failing to pay sales tax for total loss claims as expressly required by the contracts and also using Vehicle Valuation Reports that apply PSAs to calculate the ACV of the totaled vehicle, resulting in Defendants' failure to pay the full ACV for the totaled cars as promised by the standard form policy contracts.  Thus, this case is well-suited for class-wide adjudication.  Said predominant common questions include, but are not limited to, the following:

(a) Whether Defendants' standardized form policies expressly promise that the Limit of Liability for loss claims covered by the comprehensive or collision provisions of the policies to pay, *inter alia*, the Actual Cash Value of the stolen or damaged property;

(b) Whether Defendants in paying Plaintiff's and members of the Classes' total loss claims used the value of Plaintiff's and members of the Classes' total loss vehicles specified in Vehicle Valuation Reports that employed PSAs to determine the amount of the total loss vehicles' value;

(c) Whether the use of PSAs in the Vehicle Valuation Reports for Plaintiff's and members of the Classes' total loss vehicles resulted in the amount of the total loss vehicles' value being lower than it would have been without the use of PSAs;

(d) Whether the use of PSAs to determine a total loss vehicle's value is valid and

supportable;

(e) Whether application of PSAs to determine the amount Defendants paid to Plaintiff and members of the Classes for their total loss vehicles' value constitutes a breach of their policy;

(f) Whether the PSA is baseless and invalid;

(g) Whether Defendants' standardized form policies expressly provide that the insurer's payment for loss will include the "applicable sales tax" for a damaged or stolen auto if the loss claim is paid in money;

(h) Whether Defendants' monetary payment of Plaintiff's and members of the Classes' total loss claims included applicable sales tax;

(i) Whether Defendants' failure to include sales tax in their monetary payment of Plaintiff's and members of the Classes' total loss claims constitutes a breach of their policy;

(j) Whether John Does 1 through 21 administered Trumbull's total loss claims for Plaintiff and the Class members;

(k) Whether John Does 1 through 21 administered other The Hartford insurers' total loss claims for Plaintiff and the Class members;

(l) Whether John Does 1 through 21 tortiously interfered with Plaintiff's and Class members' contractual relationship with Defendants;

(m) Whether declaratory judgment against Hartford Southeast is appropriate;

(n) Whether Plaintiff and the Classes are entitled to compensatory damages.

86.    **Superiority.** Pursuant to Rule 23(b)(3), a class action is superior to the other available methods for a fair and efficient adjudication of the controversy because, among other reasons, it is desirable to concentrate the litigation of the members of the Classes in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications.

Furthermore, because the damages suffered by individual members of the Classes is relatively small, their interests in maintaining separate actions are questionable and the expense and burden of individual litigation makes it impracticable for members of the Classes to seek individual redress for the wrongs done to them. Plaintiff knows of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action. Indeed, the Classes are readily definable, and the prosecution of this class action would reduce the possibility of repetitious litigation.

87.     The issues related to Plaintiff's claims do not vary from the issues relating to the claims of the other members of the Classes such that a class action provides a more efficient vehicle to resolve this claim than through a myriad of separate lawsuits.

88.     Certification of the above Classes is also supported by the following considerations:

    a. The relatively small amount of damages that members of the Classes have suffered on an individual basis would not justify the prosecution of separate lawsuits;

    b. Counsel in this class action is not aware of any previously filed litigation against the Defendants in which any of the members of the Classes are a party and which any question of law or fact in the subject action can be adjudicated; and

    c. No difficulties would be encountered in the management of Plaintiffs' claims on a class action basis, because the Classes are readily definable and the prosecution of this class action would reduce the possibility of repetitious litigation.

89.     Defendants' unlawful practices in failing to pay the full "applicable sales tax" for the totaled auto when they approve comprehensive or collision loss claims for autos they declare total losses, despite the standardized personal auto policies explicitly stating that total loss claims will include payment of such taxes, are ongoing. Defendants' unlawful practices in applying a PSA to the totaled auto, which results in an arbitrary and wrongful downward adjustment to the calculation of the ACV of the auto, despite the standardized personal auto policies explicitly stating that the full ACV will be paid for the total loss claim, are ongoing. Injunctive relief and declaratory relief are necessary to stop these repeated and continued violations, which are likely to continue,

repeat, and cause damages to the Classes in the future.

90.     In the alternative, the Classes may be certified pursuant to Fed. R. Civ. P. 23(b)(2) because adjudications with respect to individual class members would as a practical matter be dispositive of the other members of the Classes given that their claims all emanate from a common provision in their standard form insurance policies and the risk of inconsistent or varying adjudications with respect to individual class members would establish incompatible standards of conduct for Defendants with respect to whether failure to pay the full applicable sales tax for total loss autos is required by and breaches common provisions of standard form policies.

91.     Also, in the alternative, the Classes may be certified pursuant to Fed. R. Civ. P. 23(b)(2) because adjudications with respect to individual class members would as a practical matter be dispositive of the other members of the Classes given that their claims all emanate from a common provision in their standard form insurance policies and the risk of inconsistent or varying adjudications with respect to individual class members would establish incompatible standards of conduct for Defendants with respect to whether failure to pay the full ACV for total loss autos is required by the common provisions of the standard form policies and Defendants' conduct in applying PSAs to total loss autos constitutes breaches of those common provisions of the standard form policies.

92.     Further, under Fed. R. Civ. P. 23(b)(1), prosecuting separate actions under these circumstances risks inconsistent or varying adjudications that could create incompatible standards of conduct for Defendants to follow, and/or adjudications for individual members of the Classes that could be dispositive of unnamed class members' claims and may substantially impair or impede their ability to protect their interests.

93.     The action may alternatively be maintained as a class action with respect to particular issues, pursuant to Fed. R. Civ. P. 23(c)(4).

94.     All conditions precedent to suit have occurred or been performed.

## CAUSES OF ACTION

## COUNT I: BREACH OF CONTRACT

95.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

96.    Plaintiff brings this count individually and on behalf of the Projected Sold Adjustment Class against Defendant Trumbull.

97.    Plaintiff was a party to a standardized insurance contract with Defendant Trumbull as described herein and attached as Exhibit 1.  All Projected Sold Adjustment Class members were parties to a standardized insurance contract with Defendant Trumbull containing materially identical terms.

98.    Plaintiff and each of the Projected Sold Adjustment Class members made physical damage coverage claims under their standardized insurance contracts.  Defendant Trumbull or John Does 1 through 21 acting as Trumbull's claim administrator, determined them to be first-party total losses covered under the insurance contract and administered these covered total loss claims.

99.    Pursuant to the standardized insurance contract, upon the loss of their insured autos, Defendant Trumbull purported to pay Plaintiff and each of the Class members the ACV of their totaled cars.

100.    Defendant Trumbull, by paying their comprehensive or collision loss claims, determined that Plaintiff and each Projected Sold Adjustment Class member complied with the terms of their Trumbull personal automobile policies, and fulfilled all duties and conditions under the policy contract to be paid on his or her total loss of the auto.

101.    However, Defendant Trumbull failed to pay Plaintiff and the Class members the ACV of their totaled vehicles as promised under the insurance contract because Defendant Trumbull or John Does 1 through 21 acting as Trumbull's claim administrator, applied an arbitrary

and baseless "Projected Sold Adjustment" to comparable cars used to determine the value of the totaled car to reduce the value of Plaintiff's and the Projected Sold Adjustment Class members' totaled cars.

102.    Trumbull's conduct in breaching Plaintiff's and every Projected Sold Adjustment Class members' insurance contract by applying an arbitrary and baseless "Projected Sold Adjustment" to comparable cars used to determine the value of the totaled car to reduce the value of Plaintiff's and the Projected Sold Adjustment Class members' totaled cars also constitutes a breach of the implied covenant of good faith and fair dealing.

103.    As a result of said breaches, Plaintiff and the Projected Sold Adjustment Class members were injured because they did not receive the full total loss benefits under the contract and their total loss claims were all underpaid because they did not include the full ACV for their total loss auto.  As such, Plaintiff and the Projected Sold Adjustment Class members have incurred damages in an amount to be proven at trial.

## COUNT II: BREACH OF CONTRACT

104.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

105.    Plaintiff brings this count individually and on behalf of the Sales Tax Class against Defendant Trumbull.

106.    Plaintiff was a party to a standardized insurance contract with Trumbull as described herein and attached as Exhibit 1.  All Sales Tax Class members were parties to a standardized insurance contract with Trumbull containing materially identical terms.

107.    Plaintiff and the Sales Tax Class members paid for collision or comprehensive coverages on the autos listed on their Trumbull personal automobile policies.  Thus, the insurance contract's provisions under the contract's "Coverage for Damage To Your Auto" applied to

Plaintiff and the Sales Tax Class members alike. In this section of the standardized policy, Plaintiff's and the Sales Tax Class members' Trumbull standardized personal automobile policies expressly stated that payment for loss claims will include the "applicable sales tax" to the damaged or stolen property if Trumbull pays for the loss in money.

108.    Plaintiff and the Sales Tax Class members made a comprehensive or collision loss claim under the "Coverage for Damage To Your Auto" provisions of the Trumbull standardized policy. Either Trumbull or John Does 1 through 21 acting as Trumbull's claim administrator, determined Plaintiff's and the Sales Tax Class members' loss claims to be covered claims. Defendant Trumbull or John Does 1 through 21 acting as Trumbull's claim administrator, approved Plaintiff's and the Sales Tax Class members' claims and declared their autos total losses.

109.    Pursuant to the terms set forth in the "Coverage for Damage to Your Auto" section of the policy contract, Trumbull elected to pay Plaintiff's and the Sales Tax Class members' total loss claims in money.

110.    Trumbull, by paying their comprehensive or collision loss claims, determined that Plaintiff and each Sales Tax Class member complied with the terms of their Trumbull personal automobile policies, and fulfilled all duties and conditions under the policy contract to be paid on his or her total loss of the auto.

111.    Pursuant to the aforementioned materially the same contractual provisions, upon approving Plaintiff's and the Sales Tax Class members' claims and declaring their autos total losses and electing to pay their claims in money, the contract required Trumbull to include the "applicable sales tax" for the totaled auto as part of payment for Plaintiff's and the Sales Tax Class members' total loss claims.

112.    Trumbull did not pay full applicable sales tax to Plaintiff and the Sales Tax Class members. Indeed, Trumbull paid no sales tax whatsoever for Plaintiff's approved total loss claim

of a totaled auto and other members of the Sales Tax Class.

113.    Trumbull's failure to provide the promised coverage constitutes a material breach of contract with Plaintiff and every Sales Tax Class member.

114.    Trumbull's conduct in breaching Plaintiff's and every Sales Tax Class members' insurance contract by failing to pay full applicable sales tax on their approved total loss claims also constitutes a breach of the implied covenant of good faith and fair dealing.

115.    As a result of said breaches, Plaintiff and the Sales Tax Class members were injured because they did not receive the full total loss benefits under the contract and their total loss claims were all underpaid because it did not include the full applicable sales tax for their total loss auto. As such, Plaintiff and the Sales Tax Class members have incurred damages in an amount to be proven at trial.

## COUNT III: NEGLIGENCE

116.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

117.    Plaintiff brings this count individually and on behalf of the other Projected Sold Adjustment Claims Administrator Class members against Defendants John Does 1 through 21.

118.    Defendants John Does 1 through 21 are Trumbull's, Hartford Southeast's and the other Hartford Insurer Group insurers' claims administrator. As such, John Does 1 through 21 owed Plaintiff and the other Projected Sold Adjustment Claims Administrator Class members a duty of care to process and administer their total loss claims with reasonable care and to act in conformance with the provisions of their policies.

119.    Plaintiff's and the other Projected Sold Adjustment Claims Administrator Class members' personal automobile policies issued by Trumbull, Hartford Southeast, and upon information and belief, the other Hartford Insurer Group insurers promised to pay the full ACV for

Plaintiff's and the Projected Sold Adjustment Claims Administrator Class members' approved total loss claims brought under the comprehensive and/or collision provisions of their policies.

120.    John Does 1 through 21 processed, administered, approved and otherwise made payments to Plaintiff and the other Projected Sold Adjustment Claims Administrator Class members for their total loss claims brought under the comprehensive and/or collision provisions of their Hartford Insurer Group policies.

121.    John Does 1 through 21 breached their duties owed to Plaintiff and the other Projected Sold Adjustment Claims Administrator Class members by authorizing or directing their third-party vendor, Mitchell, to apply arbitrary and baseless PSAs to calculate the value of Plaintiff's and the other Projected Sold Adjustment Claims Administrator Class members' totaled autos in the Vehicle Valuation Reports. Application of the PSAs resulted in a significant downward adjustment to the value of each comparable vehicle used in the Report to determine the ACV of Plaintiff's and the Projected Sold Adjustment Claims Administrator Class members' totaled autos. This, in turn, improperly reduced the ACV of Plaintiff's and other Projected Sold Adjustment Claims Administrator Class members' totaled autos.

122.    John Does 1 through 21 also breached their duties owed to Plaintiff and other Projected Sold Adjustment Claims Administrator Class members by relying on the Vehicle Valuation Reports, which apply the arbitrary and baseless PSAs, to authorize or make payments to Plaintiff and the other Projected Sold Adjustment Claims Administrator Class members for their approved total loss claims that did not include payment for the full ACV of their totaled autos.

123.    John Does 1 through 21 further breached their duties owed to Plaintiff and the Projected Sold Adjustment Claims Administrator Class members by providing them with written settlement statements and Vehicle Valuation Reports that inaccurately and misleadingly portrayed the amount of ACV owed to them by their Hartford Group Insurer for their total loss claims. Indeed,

the ACV stated in the written settlement statements and Vehicle Valuation Reports were based on application of the arbitrary and baseless PSAs as described throughout this Complaint. John Does 1 through 21 then breached their duties by failing to correct the misleading or otherwise inaccurate written settlement statements and Vehicle Valuation Reports.

124.    As a direct and proximate result of John Does 1 through 21's breaches of the duties they owed to Plaintiff and other members of the Projected Sold Adjustment Claims Administrator Class, Plaintiff and the other members of the Projected Sold Adjustment Claims Administrator Class were systematically and substantially underpaid for their total loss claims.  Accordingly, John Does 1 through 21's conduct injured Plaintiff and the other members of the Projected Sold Adjustment Claims Administrator Class.

## COUNT IV: NEGLIGENCE

125.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

126.    Plaintiff brings this count individually and on behalf of the Sales Tax Claims Administrator Class members against Defendants John Does 1 through 21.

127.    Plaintiff's and the other Sales Tax Claims Administrator Class members' personal automobile policies issued by Trumbull, Hartford Southeast, and upon information and belief, the other Hartford Insurer Group insurers expressly states that monetary payments for total loss claims brought under the comprehensive and/or collision provisions of their policies will include the "applicable sales tax" for the totaled auto.

128.    John Does 1 through 21 processed, administered, approved and otherwise made payments to Plaintiff and the other Sales Tax Claims Administrator Class members for their total loss claims brought under the comprehensive and/or collision provisions of their Hartford Insurer Group policies.

129.    John Does 1 through 21 breached their duties to Plaintiff and other Sales Tax Claims Administrator Class members by authorizing or making payments to them for their total loss claims that did not include the full applicable sales tax for the total loss auto as required by express provisions of their policies.

130.    John Does 1 through 21 further breached their duties to Plaintiff and other Sales Tax Claims Administrator Class members by failing to include or otherwise ignoring the Vehicle Valuation Reports' proper calculation of the applicable sales tax owed for payment of Plaintiff and other Sales Tax Claims Administrator Class members total loss claims in the written settlement statements John Does 1 through 21. This misleadingly and inaccurately portrayed the amount of sales tax owed for payment of Plaintiff's and other Sales Tax Claims Administrator Class members' total loss claims. John Does 1 through 21 then breached their duties by failing to correct the misleading or otherwise inaccurate written settlement statements.

131.    As a direct and proximate result of John Does 1 through 21' s breaches of the duties they owed to Plaintiff and members of the Sales Tax Claims Administrator Class, Plaintiff and other members of the Sales Tax Claims Administrator Class were systematically and substantially underpaid for their total loss claims because they were not paid the full applicable sales tax owed under their policies.  Accordingly, John Does 1 through 21's conduct injured Plaintiff and other members of the Sales Tax Claims Administrator Class.

## COUNT V: TORTIOUS INTERFERENCE WITH CONTRACT

132.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

133.    Plaintiff brings this count individually and on behalf of the Projected Sold Adjustment Claims Administrator Class members against Defendants John Does 1 through 21.

134. Plaintiff and members of the Projected Sold Adjustment Claims Administrator Class all had valid standardized personal auto policies issued by Trumbull or another Hartford Insurer Group insurer. Plaintiff and members of the Projected Sold Adjustment Claims Administrator Class all had an identical or materially similar provision, wherein the insurer expressly promised to pay the ACV, for the damaged or stolen auto if Plaintiff and Projected Sold Claims Administrator Class members made a comprehensive or collision coverage loss claim under their policy and the claim was approved as a total loss.

135. Plaintiff and members of the Projected Sold Adjustment Claims Administrator Class all made comprehensive or collision coverage loss claims under their policy with Trumbull or another Hartford Insurer Group insurer for their covered damaged or stolen auto that were declared by their insurer to be a total loss, and were each paid in money for the total loss claim by their insurer.

136. John Does 1 through 21 acted as the claim administrator for Plaintiff's and members of Projected Sold Adjustment Claims Administrator Class's loss claims they submitted to Trumbull or another Hartford Insurer Group insurer. Indeed, upon information and belief, all total loss claims submitted to a Hartford Insurer Group insurer are processed and administered at The Hartford Centralized Total Loss Center. As such, John Does 1 through 21 had knowledge of and were familiar with the standardized policies the Hartford Insurer Group insurers issued to Plaintiff and the Projected Sold Adjustment Claims Administrator Class members. John Does 1 through 21 were charged with administering the claims in accord with the express terms of the policies. Thus, John Does 1 through 21 knew Plaintiff's and the other Projected Sold Adjustment Claims Administrator Class members' policies all contained an identical or materially identical express provision promising payment of the ACV for the damaged or stolen autos as part of a loss claim under the policy's comprehensive or collision coverages.

137.    John Does 1 through 21 intentionally caused Plaintiff's and members of the Projected Sold Adjustment Claims Administrator Class's Hartford Insurer Group insurers to breach their policies with Plaintiff and the Projected Sold Adjustment Claims Administrator Class. John Does 1 through 21 did so by following a common plan and practice of directing Defendants' third-party vendor, Mitchell, to systemically reduce total loss valuations by applying a Projected Sold Adjustment to determine the ACV of the totaled car.  As Defendants know, the Projected Sold Adjustment is invalid because it does not reflect market realties and runs counter to customary automobile dealer and inventory management practices.  Yet, John Does 1 through 21 directed Mitchell to impose the Projected Sold Adjustment so that it artificially reduces the ACV calculation of the total loss auto. John Does 1 through 21 then used this artificially reduced ACV calculation as the basis to pay Plaintiff and the Projected Sold Adjustment Claims Administrator Class for their total loss autos.  Engaging in this practice is unjustified because it resulted in Plaintiff and the Projected Sold Adjustment Claims Administrator Class in receiving less than the ACV of the totaled auto in violation of their contracts with their Hartford Insurer Group insurer.

138.    As a result of John Does 1 through 21 conduct, Plaintiff and the Projected Sold Administrator Class did not receive the full benefit of their contracts with their insurers because the correct and full ACV was not paid as part of their total loss claim settlement.  This resulted in systematic and substantial underpayment of Plaintiff's and Projected Sold Adjustment Claims Administrator Class members' total loss claims.  Thus, Plaintiff and the Projected Sold Adjustment Claims Administrator Class have incurred damages in an amount to be proven at trial.

139.    Defendant John Does 1 through 21 acted with actual malice in that they acted with a desire to underpay Plaintiff and the Projected Sold Adjustment Administrator Class and deprive them of monies owed to them under their policies for their total loss claims.

## COUNT VI: TORTIOUS INTERFERENCE WITH CONTRACT

140.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

141.    Plaintiff brings this count individually and on behalf of the Sales Tax Claims Administrator Class members against Defendants John Does 1 through 21.

142.    Plaintiff and members of the Sales Tax Claims Administrator Class all had valid standardized personal auto policies issued by Trumbull or another Hartford Insurer Group insurer. Plaintiff and members of the Sales Tax Claims Administrator Class all had an identical or materially similar provision, wherein the insurer expressly promised to pay the "applicable sales tax" for the damaged or stolen auto if Plaintiff and Sales Tax Claims Administrator Class members made a comprehensive or collision coverage loss claim under their policy, the claim was approved, and the insurer paid the loss claim in money.

143.    Plaintiff and members of the Sales Tax Claims Administrator Class all made comprehensive or collision coverage loss claims under their policy with Trumbull or another Hartford Insurer Group insurer for their covered damaged or stolen auto that were declared by their insurer to be a total loss, and were each paid in money for the total loss claim by their insurer.

144.    John Does 1 through 21 acted as the claim administrator for Plaintiff's and members of the Sales Tax Adjustment Claims Administrator Class's loss claims they submitted to Trumbull or another Hartford Insurer Group insurer.  Indeed, upon information and belief, all total loss claims submitted to a Hartford Insurer Group insurer are processed and administered at The Hartford Centralized Total Loss Center.  As such, John Does 1 through 21 had knowledge of and were familiar with the standardized policies the Hartford Insurer Group insurers issued to Plaintiff and the Projected Sold Adjustment Claims Administrator Class members. John Does 1 through 21 were charged with administering the claims in accord with the express terms of the policies. Thus, John

Does 1 through 21 knew Plaintiff's and the other Sales Tax Claims Administrator Class members' policies all contained an identical or materially identical express provision promising payment of the full "applicable sales tax" for the damaged or stolen auto if their approved loss claims under the comprehensive or collision provisions of their policies were paid in money.

145.    John Does 1 through 21 intentionally caused Plaintiff's and members of the Sales Tax Claims Administrator Class's Hartford Insurer Group insurers to breach their policies with Plaintiff and the Sales Tax Claims Administrator Class. John Does 1 through 21 did so by following a common plan and practice of sending Plaintiff and the Sales Tax Claims Administrator Class misleading and deceptive written settlement statements on behalf of their insurers. These written settlement statements were misleading and deceptive in that they represented to Plaintiff and the Sales Tax Claims Administrator Class that "$0.00" sales tax was owed for the totaled auto or otherwise inaccurately understated the sales tax amounts owed. After disseminating the misleading or inaccurate information concerning payment of sales tax as part of Plaintiff's and other Sales Tax Claims Administrator Class members' claim settlements, John Does 1 through 21 either did not pay the full applicable sales tax owed for Plaintiff's and other Sales Tax Claims Administrator Class members' claims or caused this to occur, which resulted in the Hartford Insurer Group insurers breaching their contracts with Plaintiff and the Sales Tax Claims Administrator Class members. John Does 1 through 21 had no justification to cause this breach of the Hartford Insurer Group insurers' standardized personal auto policies, as the insurance policies explicitly provide that payment of the applicable sales tax for the totaled auto is to be included as part of the settlement for total loss claims paid in money.

146.    As a result of John Does 1 through 21 conduct, Plaintiff and the Sales Tax Claims Administrator Class did not receive the full benefit of their contracts with their insurers because the correct and full applicable sales tax was not paid as part of their total loss claim settlements. This

resulted in systematic and substantial underpayment of Plaintiff's and the Sales Tax Claims Administrator Class members' total loss claims. Thus, Plaintiff and the Sales Tax Claims Administrator Class have incurred damages in an amount to be proven at trial.

147.    Defendant John Does 1 through 21 acted with actual malice in that they acted with a desire to underpay Plaintiff and the Sales Tax Administrator Class and deprive them of monies owed to them under their policies for their total loss claims.

## COUNT VII: DECLARATORY JUDGMENT

148.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

149.    Plaintiff brings this count individually and on behalf of the Projected Sold Adjustment Declaratory Judgment Class members against Defendant Hartford Southeast.

150.    Section 2201 of the Declaratory Judgment Act ("DJA") provides that, "[i]n a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

151.    Section 2202 of the DJA states that, "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

152.    All members of the Projected Sold Adjustment Declaratory Judgment Class, including Plaintiff, currently hold an automobile insurance policy issued by Hartford Southeast and pay for collision or comprehensive coverages on one or more automobiles listed on the automobile insurance policy.

153.    Upon information and belief, John Does 1 through 21 administer total loss claims for Hartford Southeast as well as the other Hartford Insurer Group insurers at the Hartford

Centralized Total Loss Center.  John Does 1 through 21 use a common scheme to administer all Hartford Insurer Group insurers' total loss claims. This common scheme, as described more fully above, includes directing Mitchell to apply an invalid Projected Sold Adjustment when calculating the ACV of totaled autos, resulting in the ACV being artificially reduced and Plaintiff and the Projected Sold Adjustment Declaratory Judgment Class not being paid the full ACV of the totaled auto by Hartford Southeast.

154.    A dispute between Hartford Southeast and Plaintiff and the other members of the Projected Sold Adjustment Declaratory Judgment Class is before this Court concerning the parties' rights and obligations under the standardized form personal auto policies Hartford Southeast issued to Plaintiff and the Projected Sold Adjustment Declaratory Judgment Class members.  Each of these form policies contain either the following identical or materially the same Limit of Liability provision, which promises to pay, *inter alia*, the "actual cash value of the stolen or damaged property."

155.    The parties dispute whether these standardized personal auto policies require Hartford Southeast to pay the full ACV of the total loss auto for a total loss claim under the comprehensive or collision provisions of the policies.

156.    Hartford Southeast's unlawful common policy and general business practices of failing to pay the full ACV owed as stated in the policy is ongoing.

157.    Plaintiff, therefore, seeks a declaration on behalf of herself and the Projected Sold Adjustment Declaratory Judgment Class that the standard form personal auto insurance policies Hartford Southeast issues containing the Limit of Liability provision promising to pay, *inter alia*, the "actual cash value of the stolen or damaged property" requires Hartford Southeast to pay the full ACV for the damaged or stolen auto, as part of the monetary settlement of a loss claim brought under the policy's comprehensive or collision coverages, when the claim is approved, the auto is

declared a total loss, and Hartford Southeast elects to pay the "actual cash value of the stolen or damaged property" for the covered total loss claim. More specifically, Plaintiff seeks a declaration on behalf of herself and the Projected Sold Adjustment Declaratory Judgment Class that applying a Projected Sold Adjustment in the manner described more fully herein to calculate the ACV of the totaled auto does not result in payment of the full ACV of the totaled auto as required by the standardized policy when a loss claim is approved under the policy's comprehensive or collision provisions, the auto is declared a total loss, and Hartford Southeast elects to pay the "actual cash value of the stolen or damaged property" for the covered total loss claim. Plaintiff further seeks injunctive relief flowing from this declaration.

## COUNT VIII: DECLARATORY JUDGMENT

158.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

159.    Plaintiff brings this count individually and on behalf of the Sales Tax Declaratory Judgment Class members against Defendant Hartford Southeast.

160.    Section 2201 of the Declaratory Judgment Act ("DJA") provides that, "[i]n a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

161.    Section 2202 of the DJA states that, "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

162.    All members of the Sales Tax Declaratory Judgment Class, including Plaintiff, currently hold an automobile insurance policy issued by Hartford Southeast and pay for collision or comprehensive coverages on one or more automobiles listed on the automobile insurance policy.

163.    Upon information and belief, John Does 1 through 21 administers total loss claims for Hartford Southeast as well as the other Hartford Insurer Group insurers at the Hartford Centralized Total Loss Center.  John Does 1 through 21 uses a common scheme to administer all Hartford Insurer Group insurers' total loss claims. This common scheme, as described more fully above, includes failing to pay the full applicable sales tax on covered total loss claims, as shown by John Does 1 through 21 administration of Plaintiff's Trumbull total loss claim described above.

164.    A dispute between Hartford Southeast and Plaintiff and the other members of the Sales Tax Declaratory Judgment Class is before this Court concerning the parties' rights and obligations under the standardized form personal auto policies Hartford Southeast issued to Plaintiff and the Sales Tax Declaratory Judgment Class members.  Each of these form policies contain either the following identical or materially the same provision concerning monetary payment of a comprehensive or collision loss claim: "If we pay for loss in money, our payment will include the applicable sales tax for the damaged or stolen property."

165.    The parties dispute whether these standardized personal auto policies require Hartford Southeast to pay the full applicable sales tax owed for the loss of a damaged or stolen auto, whether owned, financed or leased, when Plaintiff and members of the Sales Tax Declaratory Judgment class submits a collision or comprehensive loss claim to Hartford Southeast for the loss of their auto in accord with the policy, the claim is approved and the auto is declared a total loss, and Hartford Southeast pays the claim in money.

166.     Harford Southeast's unlawful common policy and general business practices of failing to pay the full applicable sales tax owed as stated in the policy is ongoing.

167.    Plaintiff, therefore, seeks a declaration on behalf of herself and the Sales Tax Declaratory Judgment Class that the standard form personal auto insurance policies Hartford Southeast issues containing the "applicable sales tax" provision or a materially similar provision as

described herein requires Hartford Southeast to pay the full applicable sales tax owed for the damaged or stolen auto as part of the monetary settlement of a loss claim brought under the policy's comprehensive or collision coverages, when the claim is approved, the auto is declared a total loss, and Hartford Southeast decides to pay the claim in money.  Plaintiff further seeks injunctive relief flowing from this declaration.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and on behalf of the members of the Classes requests an award, relief and entry of a judgment, as follows:

A.     An order certifying that this action is properly brought and may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure; that Plaintiff be appointed representative of the Classes; and that Plaintiff's counsel be appointed counsel of the Classes.

B.     Compensatory damages, in an amount determined at trial.

C.     Punitive damages to the extent permitted by applicable law, in an amount determined at trial.

D.     An Order requiring an accounting for, and imposition of, a constructive trust upon all monies Defendants received as a result of the unlawful conduct alleged herein.

E.     An Order providing declaratory and injunctive relief for the Projected Sold Adjustment Declaratory Judgment Class and Sales Tax Declaratory Judgment Class as the Court deems to be appropriate.

F.      An Order declaring Defendants' conduct to be unlawful and in violation of the parties' Policy contracts and applicable law.

G.     An Order awarding Plaintiff her costs of suit, including and pre- and post-judgment interest and attorneys' fees, to the extent they may be awarded for each Count.

H.    Such other and further relief as may be deemed necessary or appropriate for any of the claims asserted.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 17, 2024

**FEINSTEIN DOYLE PAYNE & KRAVEC, LLC**

By:    /s/Edward J. Feinstein
Edward J. Feinstein (CT31843)
Joseph N. Kravec, Jr., Esquire
(*Pro Hac Vice* to be filed)
Ruairi McDonnell, Esquire
(*Pro Hac Vice* to be filed)
Kaitlyn M. Burns, Esquire
(*Pro Hac Vice* to be filed)
29 Broadway, 24th Floor
New York, NY 10006-3205
Telephone: (212) 952-0014
Email: jkravec@fdpklaw.com
Email: rmcdonnell@fdpklaw.com
Email: kburns@fdpklaw.com

and

429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007

Antonio Vozzolo, Esquire
(*Pro Hac Vice* to be filed)
Andrea Clisura, Esquire
(*Pro Hac Vice* to be filed)
**VOZZOLO LLC**

499 Route 304
New City, New York 10956
Telephone: (201) 630-8820
Facsimile: (201) 604-8400
Email: avozzolo@vozzolo.com
Email: aclisura@vozzolo.com

-and-

345 Route 17 South
Upper Saddle River, New Jersey 07458
Telephone: (201) 630-8820
Facsimile: (201) 604-8400

***Counsel for Plaintiff and***
***the Proposed Classes***